UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CROWN CASTLE USA INC., et al.,

                          Plaintiffs,

             v.

FRED A. NUDD CORPORATION, et al.,

                    Defendants.

_____

<u>REPORT & RECOMMENDATION</u>

05-CV-6163T

## <u>PRELIMINARY STATEMENT</u>

By order dated December 21, 2005, the above-captioned matter has been referred to the undersigned for the supervision of pretrial discovery and the hearing and disposition of all non-dispositive motions, pursuant to 28 U.S.C. §§ 636(b)(A) and (B). (Docket # 23). Currently pending before this Court are motions by defendants Fred A. Nudd Corporation ("Nudd") and Underhill Consulting Engineers and George Underhill (collectively, "Underhill") for sanctions against plaintiffs for spoliation of evidence and the late production of certain documents responsive to their discovery requests.[1] (Docket ## 186, 193). Specifically, defendants allege that plaintiffs failed to preserve relevant electronic documents, which were ultimately destroyed,[2] and did not timely produce other responsive documents, and they seek dismissal of plaintiffs' claims as a sanction for that conduct. The motions have been referred to me for report and

_____

[1] Underhill's motion incorporates Nudd's arguments and exhibits. (Docket # 193 at ¶ 3).

[2] Following oral argument on this motion, plaintiffs filed a motion for sanctions against Nudd, also based on spoliation of evidence. (Docket # 214). A separate report and recommendation will issue on that motion.

recommendation by the Honorable Michael A. Telesca, United States District Judge.  (Docket ## 188, 194).

## FACTUAL BACKGROUND

### I. Plaintiffs' Claims

Plaintiffs Crown Castle USA, Inc., Crown Castle GT Company LLC, Crown Castle Atlantic LLC, Crown Atlantic Company LLC and Crown Communication Inc. (collectively, "Crown") filed this action on April 8, 2005, asserting claims against defendants arising from alleged defects in thirty-nine cellular telephone towers (known as "monopoles") owned by Crown that were designed and manufactured by Nudd.  (Docket # 1).  According to the amended complaint, Crown's claims arise out of the following events.  (Docket # 145).

In January 2001, Crown entered into an agreement with Nudd to design and manufacture twelve monopoles.  (*Id.* at ¶¶ 15, 20).  Nudd guaranteed its work to be free from defects for one year from the date of final acceptance of the completed work.  (*Id.* at ¶ 16).  In addition to the twelve monopoles that Nudd designed and constructed directly for Crown, Crown also owned another twenty-seven monopoles designed and constructed by Nudd, which Crown had purchased from other entities, such as Verizon Wireless.  (*Id.* at ¶¶ 21-23).

On November 13, 2003, a monopole owned by another company that had been designed by Nudd collapsed in Oswego, New York.  (*Id.* at ¶ 24).  When Crown learned of the collapse, it decided to evaluate its own Nudd-designed and manufactured monopoles.  (*Id.* at ¶¶ 25-26).  Based upon that evaluation, Crown determined that those monopoles were defectively designed and constructed.  According to Crown, the Nudd monopole design had failed to

incorporate a 1.69 wind gust response factor when calculating wind load, making the monopoles inadequate to support the antennas for which they were designed. (*Id.* at ¶¶ 29-33; Docket # 132 at 8). This design flaw also rendered the monopoles non-compliant with applicable industry standards, namely, the TIA/EIA-222 Structural Standards for Steel Antenna Towers and Antenna Supporting Structures ("TIA/EIA-222 standard"). (Docket # 145 at ¶¶ 34-35).

In its amended complaint, Crown contends that Nudd concealed the defect and attempted to repair the monopoles without Crown's knowledge. (*Id.* at ¶¶ 40-44). Crown claims that it has incurred costs in excess of $3 million to repair the defective monopoles. (*Id.* at ¶ 49). Crown's causes of action against Nudd include claims for breach of contract, breach of express warranty, breach of implied warranty, professional negligence and fraud. (Docket # 145).

Crown also asserts claims against Underhill for professional negligence in connection with "corrections" work that Underhill undertook on behalf of Nudd between 2001 and 2003. (*Id.* at ¶¶ 51-54). During that period, Nudd retained Underhill for its engineering expertise to evaluate Nudd's monopoles. (*Id.* at ¶ 51). Crown alleges that Underhill's work encompassed an evaluation of all of the monopoles constructed by Nudd to determine whether they were defectively designed. (Docket # 151 at 5). Crown claims that Underhill breached a duty it owed to Crown by failing to advise it of the defective design and by providing Crown with reports misrepresenting the condition of the monopoles.[3] (Docket # 145 at ¶ 99).

_____

[3] On February 12, 2009, Judge Telesca granted Underhill's motion for summary judgment on an alternative theory of professional negligence asserted by Crown. (Docket # 151 at 19). That theory pertained to Underhill's review and approval of Nudd's original design plans. (*Id.* at 4-8). Judge Telesca dismissed as untimely the claims based on that theory, except as to seven specific monopoles. (*Id.* at 9-18). That dismissal notwithstanding, Crown's claims that Underhill was professionally negligent in connection with its 2001-2003 "corrections work" were permitted to proceed. (Docket # 198, Ex. C, Letter from Judge Telesca clarifying February 12, 2009 decision).

## II.  The District Court's Dismissal and Reinstatement of Certain Claims

On January 16, 2008, Judge Telesca granted partial summary judgment to Nudd and dismissed Crown's breach of contract claims relating to the twenty-seven monopoles that it had purchased from other companies, finding that those claims were time-barred under the Uniform Commercial Code's four-year statute of limitations.  (Docket # 97 at 4, 13).[4]  Judge Telesca rejected Crown's argument that the statute of limitations had been equitably tolled by Nudd's alleged fraudulent concealment of the design defect.[5]  (*Id.* at 16).  Specifically, Judge Telesca found that Nudd did not have a duty to inform Crown of the design defect.  (*Id.* at 15-16).  Judge Telesca also granted summary judgment dismissing Crown's claims of fraud and misrepresentation on the similar basis that Nudd did not have a duty to disclose the purported defect to Crown.  (*Id.* at 18-21).

Crown moved for reconsideration of the decision on the basis of newly-discovered evidence that it had learned from former Nudd employees, Clark Cogan ("Cogan"), who had been employed by Nudd as a sales manager, and Patrick Botimer ("Botimer"), who had been employed as an engineer.  (Docket # 98).  Crown proffered that information to the court through affidavits of Cogan and Botimer.  Cogan's affidavit alleged that Nudd had purposely withheld information about the design defect from customers who had not discovered it on their own.

---

[4]  *Crown Castle USA Inc. v. Fred A. Nudd Corp.*, 2008 WL 163685, *6 (W.D.N.Y. 2008).

[5]  "Under New York law equitable estoppel may be applied where a plaintiff has been induced by fraud, misrepresentation or deception to refrain from filing a timely action."  (Docket # 132 at 18 (citing *Simcuski v. Saeli*, 44 N.Y.2d 442 (1978))).  The doctrine may be invoked "where the enforcement of the rights of one party would work an injustice upon the other due to its justifiable reliance upon the initial party's words or conduct."  (*Id.* at 19 (citing *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996))).

4

(Docket # 132 at 5).[6]  Cogan also affirmed that Crown had "relied on Nudd's knowledge of the monopoles designed by Nudd and relied on Nudd's experience in the area of communications monopole engineering." (*Id.*).  According to Cogan, Nudd had misled Crown by not disclosing that the monopoles were defectively designed.  (*Id.* at 6).

In Botimer's affidavit, dated January 29, 2008, he affirmed that no Nudd monopoles designed and fabricated prior to mid-2001 complied with the TIA/EIA-222 standard because their design failed to incorporate the appropriate wind gust response factor; in mid-2001, Nudd modified its design software to apply the gust response factor.  (*Id.* at 8).  According to Botimer, a pre-2001 monopole "would almost certainly be overstressed if the original design loads were installed," but in order to discover the defect, an engineer would need to perform the calculations using the original design loads.  (*Id.*).  Botimer also stated that Nudd decided not to inform customers about the defect in the pre-2001 monopoles.  (*Id.* at 7).  In fact, although Crown had hired Nudd in 2001 and 2002 to perform structural analyses of certain monopoles, Nudd did not advise Crown of the original design flaw, but only evaluated the monopoles' ability to support additional loading.  (*Id.* at 8-9).  Finally, Botimer also stated that Crown relied on Nudd for structural engineering expertise until September 2003.  (*Id.* at 10).

In opposition to Crown's motion for reconsideration, Nudd submitted a second affidavit from Botimer.  (*Id.* at 11).  In the second affidavit, Botimer retreated from his earlier statement that Nudd's original design did not comply with the TIA/EIA-222 standard, asserting instead that Nudd had complied with the TIA/EIA-222 standard "as Nudd understood it at the time," and that the industry's interpretation of the standard had evolved since Nudd's original

---

[6]  *Crown Castle USA Inc. v. Fred A. Nudd Corp.*, 2008 WL 3841298, *2 (W.D.N.Y. 2008).

design. (*Id.* at 12). According to Botimer, Nudd's 2001 design change responded to that evolution. (*Id.* at 12-13). Botimer further denied his earlier statement that Nudd purposely hid the design flaw from any customers. (*Id.* at 13).

On August 13, 2008, Judge Telesca granted Crown's motion for reconsideration and reinstated Crown's fraud and misrepresentation claims, as well as the breach of contract claims for the twenty-seven monopoles that had been previously dismissed as time-barred. (*Id.* at 21-23). Judge Telesca found that Crown had raised issues of fact as to whether Nudd had "superior knowledge concerning the alleged defective monopoles" (thus giving rise to a duty of disclosure) and had "misrepresented the condition of its monopoles to Crown when certain problems were occurring with other customers." (*Id.* at 20). Those fact issues prevented the Court from resolving either the fraud and misrepresentation claims or the applicability of the equitable estoppel doctrine to Nudd's statute of limitations defense. (*Id.* at 20-23).

Following that decision, and two months after filing the pending motion, Nudd filed a motion seeking sanctions against Crown under Rule 11 of the Federal Rules of Civil Procedure on the grounds that the Cogan and first Botimer affidavits were false and that Crown knew or should have known of their falsity. (Docket # 204). The Rule 11 motion seeks an order from the district court vacating its August 13, 2008 reconsideration decision and reinstating its January 16, 2008 decision. (*Id.*). Judge Telesca has stayed Nudd's Rule 11 motion pending resolution of the pending instant motions. (Docket # 211).

**III.  Relevant History of Discovery**

Since its inception in February 2006, discovery in this case has wound a long and sometimes torturous path, necessitating the Court's formal and informal intervention to resolve numerous disputes.  I review only those discovery events and motions that are relevant to the resolution of the pending motions.

In January and March 2006, Underhill and Nudd, respectively, served first sets of interrogatories and document requests.  (Docket # 197 at 26).  In response, Crown produced approximately 20,000 or 30,000 pages of documents.[7]  Of the approximately 10,000 emails produced by Crown during that time, none were dated prior to November 2003, when the Oswego tower collapsed.  (Docket # 184 at 5).  That date is significant because Crown alleges that it did not know and could not have known of Nudd's design flaws until the Oswego tower fell.  (Docket # 145 at ¶ 33).  In October 2006, Nudd served a second set of discovery demands, in response to which Crown produced another approximately 10,000 pages of documents. (Docket # 197 at 27).

In March 2007, both Nudd and Crown filed motions to compel.  (Docket ## 63, 64).  During oral argument on the motions, counsel for Nudd questioned the absence from Crown's document production of any documents predating November 2003.  (Docket # 84 at 76).  Counsel for Crown responded that Crown had not chronologically limited its search for responsive documents and was not withholding such documents on relevance or privilege grounds.  (Docket # 84 at 78-82).  At the Court's request, Crown submitted a post-argument

---

[7]  Crown contends that it produced over 30,000 pages (Docket # 197 at 26-27); Nudd contends that it produced 20,000 pages (Docket # 184 at 5).

affidavit from a paralegal in its legal department who had been responsible for coordinating Crown's search affirming that Crown's search for responsive documents had not been chronologically limited. (*Id.* at 82-83; Docket # 184-8, Ex. G).

Since then, the Court has continued to oversee the parties' disputes regarding discovery. (Docket ## 85-91, 94-96, 104, 107, 108, 114, 117, 120). As a result of numerous discovery disputes, as well as other motions, the fact discovery deadline has been extended multiple times, most recently until May 8, 2009. (Docket # 174).

## IV. Late Production of Documents by Crown and Nudd

In September 2008, Nudd discovered Clark Cogan's computer in a storage facility. (Docket # 184 at 11). Cogan had been terminated from Nudd in May 2002, and his computer had not been located or searched during the course of this litigation until it was found in 2008. (*Id.*). Nudd notified Crown of the discovery in late November or early December 2008, and on December 5, 2008, produced documents, including emails, recovered from Cogan's computer. (Docket # 197-8, Ex. F at ¶¶ 11-12).

The emails produced from Cogan's computer included several between Cogan and Crown employee Andrew Bazinet ("Bazinet") during the period 2001 and 2002. (*Id.* at ¶ 13). Bazinet was a key Crown employee who, as an "Asset Specialist," was responsible for Crown's monopoles. (Docket # 184-9, Ex. H at 6-7).[8] In addition, he also participated in a

---

[8] Bazinet testified at his deposition that he is the Crown employee with the greatest knowledge of the facts of this case. (Docket # 184-9, Ex. H at 54).

small, six-member team assembled in 2004 to address Nudd monopole repairs, known as the "Nudd Repair Project."[9]  (Docket # 184-9, Ex. H at 54, 69).

After the discovery of Cogan's computer, Crown instructed more than fifteen of its current employees to re-search their records and email folders for responsive documents. (Docket # 197-8 at ¶¶ 16, 21).  As part of this renewed effort, Crown "re-reviewed Mr. Bazinet's files and discovered that in the process of retrieving Mr. Bazinet's documents, not all documents related to Crown Monopoles were captured."  (*Id.* at ¶ 14).  On January 12, 2009, Crown produced additional Bazinet emails.  (*Id.* at ¶ 15).  Production of additional documents continued through February 2009 and totaled nearly 3,000 pages, 1,442 of which were emails to or from Bazinet.  (*Id.* at ¶ 20; Docket # 184 at 12).  Most had been created prior to November 2003. (Docket # 184 at 12).  Several months later, in August 2009, Crown produced twenty-two emails from Crown's Director of Engineering Jim Kyriacopoulos, who was also a member of the Nudd Repair Project team.  (Docket # 200).

During 2009, Crown also found and produced engineering reports prepared by firms other than Nudd that analyzed the Nudd monopoles.  (Docket # 184 at 14-15).  Crown located these reports after Nudd had received similar reports in response to FOIL requests that it had made to various municipalities.  Those requests yielded copies of engineering reports prepared by other firms relating to monopoles at issue in this case, some of which were addressed

---

[9]  Other Crown employees participating on the Nudd Repair Project were Paul Lent, Vice-President of Assets and Bazinet's manager, Area President Bob Ackerman, Director of Engineering Jim Kyriacopoulos, Purchasing Director David Doty, and General Counsel Bob Lucas.  (Docket # 184-9, Ex. H at 55-56, 65-67).  The purpose of the Nudd Repair Project was "to investigate, analyze and repair Nudd monopole structures."  (*Id.* at 68). Bazinet organized the activities of the project, but did not make ultimate decisions.  (*Id.* at 66).

to Crown. (Docket # 197-8 at ¶¶ 17-18). The extent of the overlap between the records produced by the municipalities and those later produced by Crown is unclear.

The parties dispute whether these newly-produced engineering reports are in fact responsive to any of Nudd's discovery demands. Having reviewed those requests that Nudd identifies as encompassing the engineering reports, I conclude that the reports (or a subset of them) were responsive to Nudd's October 30, 2006 discovery demands. (Docket # 184-5, Ex. D at No. 3). Interrogatory 3 of those requests sought all documents reflecting the erection or removal of any antenna or other appurtenance to or from any monopole at issue in the litigation, "including but not limited to applications for municipal permits pertaining to the installation or removal of the aforesaid equipment." (*Id.*). Some, if not all, of the newly-produced engineering reports were apparently produced to the municipality to demonstrate that the structure was adequate to support the erection of additional antennas.[10] (*See* Docket # 184 at 14 n.9; Letter from David P. Marcus, Esq., dated August 31, 2009).

## V. Content of Crown's 2009 Production of Emails

As stated *supra*, Crown's 2009 production included over one thousand emails retrieved from Bazinet's computer.[11] Many of those were communications between Bazinet and

---

[10] They may also be responsive to Interrogatory 1, which sought documents relating to inspections of the monopoles at issue in the case, although the record is unclear as to whether the engineering firms that prepared the reports "inspected" the monopoles in the course of their evaluation. (*See* Letter from David P. Marcus, Esq., dated August 31, 2009). The discovery requests do not define "inspection." (*Id.*).

[11] Many of Bazinet's emails were forwarded to or copied in other Crown employees, such as Paul Lent, Bazinet's supervisor, and Project Manager Dan Vadney. (Docket # 197-30).

Nudd employees Cogan and Botimer. (Docket # 197-8 at ¶ 15). For example, the production

included over one hundred emails between Bazinet and Botimer. (*Id.* at ¶ 33).

Nudd contends that several of the belatedly-produced emails were not only

relevant to, but actually disproved the arguments that Crown made in support of its successful

motion for reconsideration by Judge Telesca. Specifically, Nudd identifies the following emails

as evidence that Crown was in fact aware of the potential defect before the Oswego tower

collapse:

- A March 19, 2002 email from Crown Project Manager Dan Vadney to a Verizon Wireless representative, which was forwarded to Bazinet, referencing a suspected "design flaw" in Nudd towers. (Docket # 184-21, Ex. Q).

- An email chain from March 4, 2003 involving Bazinet and Nudd engineer Botimer addressing another Crown employee's inquiry to Bazinet, "So what's with Nudd? I hear they have issues with their analysis program. Anything to be concerned about?"[12] (Docket # 197-27, Ex. 16).

- An email chain from June 26-27, 2003 in which Bazinet stated that Nudd had discovered that a monopole in Walworth, New York needed reinforcement and would complete the work under the warranty. (Docket # 184-25, Ex. U).

- A September 13, 2003 email from another Crown employee, on which Bazinet was copied, discussing a fire involving the Walworth monopole and stating that during the structural review of the monopole, Nudd had "recognized that the flange design for the tower was to[o] light to support the specified loadings of the antennas currently on the structure." (Docket # 184-23, Ex. S).

---

[12] According to the email, it was forwarded by Bazinet to Botimer, who replied that there was "no problem" and explained that the analysis program had been redesigned to conform to "the industry's code interpretations and as such there are no issues." (Docket # 197-27, Ex. 16).

## VI. Crown's Efforts to Preserve Relevant Documents and to Produce Responsive Documents

### A. Preservation of Relevant Documents

The record on this motion demonstrates that Crown anticipated the possibility of litigation against Nudd by August 2004, approximately eight months before it actually filed this lawsuit. In mid-August 2004, internal emails involving Crown in-house counsel reveal that Crown was considering filing claims with Nudd's insurance carrier for repairs to the monopoles. (Docket ## 184-41, Ex. KK; 184-42, Ex. LL). In addition, at that time, Crown's in-house counsel directed Bazinet to ensure that all communications regarding "the Nudd Project" be labeled as "CONFIDENTIAL ATTORNEY WORK PRODUCT PRIVILEGED COMMUNICATION" and include a notice warning that review of the communication by an unintended recipient was unauthorized. (Docket # 184-40, Ex. JJ). By mid-November 2004, Crown had retained outside counsel "for litigation purposes." (Docket # 184-43, Ex. MM).

Crown's document retention policy for electronic documents provided for their deletion within two weeks of an employee's departure from the company. Backup tapes of those documents were retained for a one-year period. Emails, by contrast with other electronic documents, were deleted within 90 days after an employee's departure from the company, but were not saved on any backup tapes or otherwise preserved as a matter of policy. (Docket # 184-36, Ex. FF). In correspondence to Nudd, Crown has admitted that:

> [r]ecords generated in the normal course of business from 2001 until this litigation were retained or not retained on an individual employee basis, and Crown expects that some records generated during that time frame were not retained by those individual employees. Any documents that were deleted by the employee are not forensically recoverable.

(Docket # 184-38, Ex. HH).

At oral argument on August 29, 2009, this Court questioned Crown's counsel concerning the measures taken by Crown to implement a litigation hold. Counsel responded that he did not recall any conversation with Crown's in-house counsel about a litigation hold or locate any records reflecting the implementation of such a hold. (Docket # 210 at 50-51). None of the papers submitted by Crown in connection with this motion describe any efforts undertaken by in-house counsel or any other Crown representative to implement a litigation hold.

### B. Collection and Production of Documents from Specific Employees

With respect to Crown's efforts to gather and produce documents responsive to defendants' discovery requests, Crown represents that defendants' document requests were provided to members of Crown's in-house legal department, and they in turn asked certain Crown employees to search for and gather responsive documents, which the legal department then reviewed and provided to litigation counsel. (*Id.* at 54-56). Employees were requested to search for, among other documents, emails regarding the Nudd monopoles. (*Id.* at 56). If an employee had questions about the production, he or she would discuss those questions with counsel. (*Id.* at 56-57). Two of Crown's outside attorneys in this case spoke with Bazinet about where and how to search for responsive documents. (*Id.* at 57).

In January 2009, following the production of emails from Cogan's computer, Nudd asked Crown to determine whether twenty-one identified employees might have additional responsive documents. Crown responded that counsel had communicated with each individual on the list who was currently employed by Crown and confirmed that none had additional responsive documents. (Docket # 184-36, Ex. FF). Outside counsel met in person with three or

four employees to review their searches; in-house counsel was responsible for communicating with the remainder of the current employees on Nudd's list, but the record is unclear as to the manner of any such communication. (Docket # 210 at 65).

## 1. **Andrew Bazinet**

Crown represents that when counsel affirmed to this Court in 2007 that Crown had searched for relevant documents predating 2004, both in-house and outside litigation counsel had previously spoken with Bazinet and he had led them to believe that he had no additional responsive documents. (Docket # 210 at 63). When counsel discovered that Nudd's production of documents from Cogan's computer included emails from Bazinet during the 2001-2002 period, counsel again questioned Bazinet about whether he had additional responsive documents. (*Id.* at 60). This conversation led to the discovery and production of the 1,442 pages of emails that had never been produced, the majority of which were created during the 2001-2003 period. (*Id.* at 63).

## 2. **Paul Lent**

Paul Lent, Bazinet's supervisor and a member of the Nudd Repair Project, ended his employment with Crown on August 10, 2005, well after Crown not only had retained outside counsel in anticipation of this litigation, but actually had commenced this lawsuit. (Docket # 184-38, Ex. HH). Following Lent's departure, his electronic documents and emails were destroyed in accordance with Crown's document retention policy. (Docket ## 197 at 35-36; 210 at 52-53). Crown concedes that Lent would have had documents pertaining to this matter "at one time," although the record is unclear as to the number or type of documents that he possessed either at the time this litigation was anticipated or commenced, or at the time of his subsequent

departure from Crown.  (Docket # 197-8 at ¶ 27).  The record is silent as to whether, or how

often, Lent deleted documents from his computer during the course of his employment.  (*Id.*).[13]

Lent testified that there were dozens of meetings and hundreds of emails regarding

the Nudd Repair Project.  (Docket # 184-47; Ex. OO2 at 189).  Crown affirms that it has

produced nearly 500 documents involving Lent that were obtained from other employees' files.

(Docket # 197-8 at ¶ 28).

### 3.  Dan Vadney

Crown Project Manager Dan Vadney testified at his May 2009 deposition that

Crown's counsel asked him before the deposition to search for documents related to Nudd

monopoles.  (Docket # 184-44, Ex. NN1 at 5).  He was given no instructions by counsel as to

how to search, so he searched for electronic documents using the word "Nudd."  (*Id.* at 6, 18-20).

No documents were retrieved.  (*Id.* at 21).  Vadney testified that it was his weekly practice to

delete emails and that he was never instructed to suspend that practice.  (*Id.* at 25-26; Docket

# 184-45, Ex. NN2 at 108).

Crown submitted an affidavit from Vadney in connection with this motion, which

affirms that Vadney does not recall the existence of any emails concerning Nudd monopole

design defects.  (Docket # 197-32 at ¶ 3).  He further affirms that his practice would have been to

forward any such emails to Bazinet.  (*Id.*).  Bazinet's emails included at least one other email

from Vadney regarding Nudd's status as an approved vendor, in addition to the one referenced

---

[13]  Nudd deposed Lent in June 2008 prior to the production of Bazinet's emails.  (Docket # 184-46, Ex. OO).

*supra* relating to communications with a Verizon Wireless representative. (Docket # 197, Ex. 19 at ¶ 9).

### 4. <u>Jim Kyriacopoulos</u>

In August 2009, Crown for the first time produced emails from Crown's Director of Engineering, Jim Kyriacopoulos. (Docket # 202 at 15). Crown represents that its "legal department specifically included Mr. Kyriacopoulos on multiple requests to review and compile documents potentially responsive to Defendants' discovery requests." (Docket # 197-8 at ¶ 22). The record does not reveal when those requests were made, whether they were written or oral and whether Kyriacopoulos responded. At his March 2009 deposition, Kyriacopoulos testified that he did not recall being asked to save or produce any Nudd-related documents and that he believed that he might still possess relevant documents. (Docket # 184-12, Ex. I1 at 11-12, 15). Despite this statement, Crown did not produce his emails until after Nudd filed this motion. (Docket # 200). The record shows that the twenty-two emails produced in August 2009 were recovered from personal folders into which Kyriacopoulos had saved emails. (*Id.* at ¶¶ 5-6). The record does not indicate whether any prior productions by Crown contained any documents from Kyriacopoulos.

### 5. <u>Doug Pineo</u>

Nudd challenges Crown's failure to preserve documents from Doug Pineo, a structural engineer employed by Crown. (Docket ## 184 at 29; 202 at 8). Bazinet testified at his deposition that Pineo was an engineer with whom he communicated. (Docket # 184-9, Ex. H1 at

48).  On this motion, neither party has described Pineo's responsibilities, if any, concerning the

Nudd monopoles.[14]


## DISCUSSION

Currently pending are motions by Nudd and Underhill for sanctions against

Crown for spoliation of evidence, the late production of documents and failure to comply with

this Court's May 3, 2007 direction to Crown to verify that it had not chronologically limited its

search for documents.[15]  I will first address the allegation of spoliation.


## I.  Spoliation

### A.  Legal Standards

"Spoliation is the destruction or significant alteration of evidence, or the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999).  A court has broad

discretion to impose appropriate sanctions under Rule 37 of the Federal Rules of Civil Procedure

where a party spoliates evidence in violation of a court order.  *See* Fed. R. Civ. P. 37(b)(2); *West*

---

[14]  The record is unclear whether Pineo is still employed at Crown, although his name does not appear on the list of terminated employees that Crown provided to Nudd.  (*See* Docket # 184-38, Ex. H).

[15]  Nudd and Underhill have also sought sanctions against Crown in connection with actions that cannot properly be labeled as spoliation.  Specifically, Nudd and Underhill seek sanctions for Crown's submission on its motion for reconsideration of the Cogan and Botimer affidavits, which Nudd claims that Crown had reason to know were false.  (Docket ## 184, 193).  Crown argues that this Court need not reach these issues because they have also been raised before the district court in Nudd's motion for sanctions under Rule 11.  (Docket # 210 at 49).  I agree and believe those issues are more appropriately addressed by the district court, which considered the affidavits in the first place.  *See* Fed. R. Civ. P. 11 ("[b]y presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support").

*v. Goodyear Tire & Rubber Co.*, 167 F.3d at 779.  *See also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106 (2d Cir. 2002).  Absent a court order, "a district court may impose sanctions for spoliation, exercising its inherent power to control litigation."  *West*, 167 F.3d at 779.  *See also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d at 106-07 (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998)); *Reilly v. NatWest Mkts. Group, Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("[w]hether exercising its inherent power or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses"), *cert. denied*, 528 U.S. 1119 (2000).

A party bringing a spoliation motion must demonstrate that:  (1) that the party charged with destroying the evidence had an obligation to preserve it; (2) the records were destroyed with a "culpable state of mind;" and (3) the destroyed evidence was relevant to the party's claim or defense.  *See Residential Funding Corp.*, 306 F.3d at 107 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107-12 (2d Cir. 2001)); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).  I will address each of the factors in turn.

## B. Analysis

### 1. Duty to Preserve

"Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?"  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. at 216 (emphasis in original).  A party is obligated to preserve evidence when it has "notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  *Fujitsu Ltd. v. Fed. Express*

18

*Corp.*, 247 F.3d 423, 436 (2d Cir.), *cert. denied*, 534 U.S. 891 (2001); *Creative Res. Group of*

*New Jersey, Inc. v. Creative Res. Group, Inc.*, 212 F.R.D. 94, 105 (E.D.N.Y. 2002).  Thus, the

duty to preserve evidence may arise when a substantial number of key personnel anticipate

litigation.  *See Toussie v. County of Suffolk*, 2007 WL 4565160, *7 (E.D.N.Y. 2007); *Zubulake*,

220 F.R.D. at 217 (speculation by one or two employees regarding a lawsuit "does not generally

impose a firm-wide duty to preserve").

    Once the duty to preserve has attached, a party should institute a litigation hold

and "suspend its routine document and retention/destruction policy."  *Toussie v. County of*

*Suffolk*, 2007 WL 4565160 at *7 (quoting *Zubulake*, 220 F.R.D. at 218).  A party must preserve

"what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to

lead to the discovery of admissible evidence, is reasonably likely to be requested during

discovery and/or is the subject of a pending discovery request."  *Zubulake*, 220 F.R.D at 217

(quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991)).  Thus, the

duty "extend[s] to any documents or tangible things (as defined by Rule 34(a)) made by

individuals 'likely to have discoverable information that the disclosing party may use to support

its claims or defenses'" or, in other words, documents made by the "key players" in the case.  *Id.*

at 217-18 (quoting Fed. R. Civ. P. 26(a)(1)(A)).

    a. **Trigger Date**:  Of course, Crown's obligation to preserve

evidence arose no later than April 8, 2005, the date on which Crown commenced this lawsuit.

(Docket # 1).  Based upon the emails produced in discovery, however, I find that the duty

actually arose as early as August 2004 – when several Crown employees, including in-house

counsel, considered filing a notice of claim with Nudd's insurance carrier and instituted a

practice of labeling Nudd-related communications as privileged under the work product doctrine[16] – and no later than October 2004 – when Crown retained outside counsel "for purposes of litigation." *See*, *e.g.*, *Houlihan v. Marriott Int'l, Inc.*, 2003 WL 22271206, *2 (S.D.N.Y. 2003) (duty to preserve evidence arose at time of plaintiff's injury where defendant's efforts to document accident suggested preparation for litigation); *Indem. Ins. Co. of N. Am. v. Liebert Corp.*, 1998 WL 363834, *4 n.3 (S.D.N.Y. 1998) (plaintiff was on notice that lawsuit was likely when it attempted to document damage and hired counsel). Whether the duty arose in August or October 2004 is immaterial to my resolution of the spoliation motion.

      **b. <u>Scope</u>**: Nudd argues that Crown failed to preserve the documents of Bazinet, Lent, Kyriacopoulos, Vadney and Doug Pineo. Accordingly, I must determine whether Crown had a duty to preserve those documents. I easily conclude that Crown should have regarded Bazinet, Lent and Kyriacopoulos, members of the Nudd Repair Project team, as key employees likely to have information relevant to the lawsuit and whose documents should have been preserved.

      I reach a different conclusion, however, with respect to Vadney. Crown states that Vadney "was not an employee known to have any pertinent information related to the Crown Monopoles or the Nudd defect issue when Crown began compiling responsive documents in 2006, or after its initial production was completed in 2006." (Docket # 197-8 at ¶ 23). Indeed, Crown alleges that Vadney's name appeared on only seven documents of the more than 30,000 produced in 2006. (*Id.* at ¶ 24). Thus, not believing that Vadney was likely to have relevant

---

[16] The work product doctrine protects from disclosure "materials prepared by a party's attorney in anticipation of litigation or for trial" unless "the party seeking production has 'substantial need' for the materials." *Matter of Grand Jury Subpoenas Dated Oct. 22, 1991, and Nov. 1, 1991*, 959 F.2d 1158, 1166 (2d Cir. 1992).

documents, Crown did not conduct a search for his documents until a 2002 email from Vadney to a Verizon Wireless employee was found on Bazinet's computer.  (*Id.* at ¶ 25).

Crown argues that it is unlikely that any additional responsive documents have been lost because Vadney would have forwarded any Nudd-related emails to Bazinet, who would have preserved those emails.  Because very few additional emails to or from Vadney have been found in Bazinet's electronic files, Crown contends that it is unlikely that any responsive documents from Vadney have been destroyed.

Crown's document production, including over one thousand emails from Bazinet, appears to support this argument.  Moreover, Vadney worked as a project manager whose connection to any Nudd project has not been demonstrated.  Accordingly, I find that Vadney's documents were not reasonably within the scope of Crown's preservation obligation.

Finally, Nudd has provided no factual allegations regarding Pineo's role within Crown, whether any documents from Pineo have been produced or the basis for Nudd's belief that Pineo likely possessed relevant documents that have been destroyed.  At most, this Court has been able to deduce that Pineo was once (and may still be) employed by Crown as an engineer and that Bazinet sometimes communicated with him.  Therefore, the record does not permit a finding that Crown was under a duty to preserve Pineo's documents.

## 2.  Culpability

"[A] finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoliator."  *Reilly v. NatWest Mkts. Group, Inc.*, 181 F.3d at 268.  Rather, a finding of gross negligence will satisfy the "culpable state of mind" requirement, as will knowing or negligent destruction of evidence.  *Id.*; *Residential Funding, Corp.*, 306 F.3d at 108 ("[t]he

sanction of an adverse inference may be appropriate in some cases involving the negligent

destruction of evidence because each party should bear the risk of its own negligence");

*Zubulake*, 220 F.R.D. at 220 ("a 'culpable state of mind' for purposes of a spoliation inference

includes ordinary negligence").

Specifically, "failure to implement a litigation hold at the outset of litigation

amounts to gross negligence." *Toussie*, 2007 WL 4565160 at *8; *see also Chan v. Triple 8

*Palace, Inc.*, 2005 WL 1925579, *7 (S.D.N.Y. 2005) ("the utter failure to establish any form of

litigation hold at the outset of litigation is grossly negligent"); *Zubulake*, 220 F.R.D. at 220-21

("[o]nce the duty to preserve attaches, any destruction of evidence is, at a minimum, negligent;"

failure to preserve backup tapes following initiation of lawsuit was grossly negligent); *Barsoum*

*v. NYC Hous. Auth.*, 202 F.R.D. 396, 400 (S.D.N.Y. 2001) (loss of tape recording of

conversation was grossly negligent).  In contrast, where the document destruction is accidental or

without fault, courts have found mere negligence.  *See*, *e.g.*, *Port Auth. Police Asian Jade Soc'y*

*of New York & New Jersey Inc. v. Port Auth. of New York and New Jersey*, 601 F. Supp. 2d 566,

570 (S.D.N.Y. 2009) (destruction of documents following September 11, 2001 terrorist attacks

was negligent); *Davis v. Speechworks Int'l, Inc.*, 2005 WL 1206894, *4 (W.D.N.Y. 2005) (no

culpability where documents were lost during a move).

Having determined that Crown's duty to preserve arose no later than October

2004, I turn to an assessment of Crown's efforts, if any, to impose a litigation hold.

At oral argument on this motion, counsel for Crown represented to the Court that

he could not recall any specific direction by him or any Crown representative to implement a

litigation hold, nor are there any documents reflecting such a hold.  Crown has not submitted any

affidavits on this motion describing any efforts that it undertook to ensure that relevant electronic documents were preserved or that Crown's document destruction policy was suspended for key employees. Outside counsel spoke with only a handful of employees regarding their efforts to search for and locate responsive documents, leaving the remainder of the responsibility to in-house counsel, about whose efforts no record has been made (beyond outside counsel's expectations concerning what in-house counsel's involvement should have entailed).

It is undisputed that Paul Lent's electronic documents were destroyed following his departure from Crown in August 2005, ten months after the duty to preserve arose and four months after this lawsuit was filed. (Docket ## 197 at 35-36; 210 at 52-53). As Bazinet's supervisor and as a member of the Nudd Repair Project, such wholesale destruction is inexcusable. Despite Lent's testimony at his deposition that there were dozens of meetings and hundreds of emails about the Nudd Repair Project, the failure to preserve his electronic documents has deprived Nudd of the opportunity to depose him about the relevant documents that he possessed. Although certain emails that Lent sent or received regarding the Nudd monopoles have been produced from Bazinet's files, the scope or nature of additional documents that Lent possessed between October 2004 and the time of his departure from Crown is unknown.

While the record contains inconsistent statements as to whether Kyriacopoulos, Crown's Director of Engineering, was ever asked to search his records for Nudd-related documents, it is clear that he was never directed to preserve documents. Further, Crown has not explained why twenty-two emails from his computer were not produced until August 2009, even though it was on notice at least at the time of his March 2009 deposition that Kyriacopoulos

believed that he might still possess relevant documents. Considering Kyriacopoulos's role in the Nudd Repair Project and his importance as Crown's Director of Engineering, Crown's failure to ensure the preservation of his documents is also inexplicable.

On this record, the only reasonable inference is that Crown failed to take adequate measures to preserve electronic documents. The destruction of all of Lent's electronic documents a mere four months following the filing of this lawsuit is wholly unacceptable in light of Lent's role as Bazinet's supervisor and a member of the six-person Nudd Repair Project team. In addition, another key employee on the Nudd Repair Project team, the Director of Engineering, was never instructed to preserve documents.

Having found that Crown failed to implement a litigation hold, resulting in the destruction of Lent's documents, I must conclude that Crown acted with gross negligence. I cannot find that Crown acted in bad faith, however, as Nudd urges. No showing has been made that Crown intentionally sought to destroy documents or to conceal them from Nudd. Crown has produced a prodigious number of documents in this litigation; unfortunately, some were inexcusably destroyed, while other were produced exceedingly late. On this record, I find that the carelessness with which Crown attended to its duties to preserve and produce documents amounted to gross negligence, but not bad faith. *Compare Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d at 438-39 (finding bad faith where defendants "took affirmative steps" to make data unavailable and provided misleading information to the court) *with De Espana v. Am. Bureau of Shipping*, 2007 WL 1686327, *3-4 (S.D.N.Y. 2007) (no bad faith even though defendant failed to issue a timely litigation hold and inaccurately represented to the court that production was complete, but also produced a "massive record of evidence"). *But see Zubulake*

*v. UBS Warburg LLC*, 229 F.R.D. 422, 436 (S.D.N.Y. 2004) (documents were willfully destroyed where employees deleted emails even after counsel's express instructions regarding a litigation hold).

### 3. **Relevance**

Finally, the moving party must show that the destroyed evidence was relevant to its claims or defenses. *Residential Funding, Corp.*, 306 F.3d at 108. As the Second Circuit has explained in the context of an application for an adverse inference,

> [R]elevant in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'

*Id.* at 108-09 (quoting *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998)). A court may assume that the destroyed evidence was relevant if it was destroyed in bad faith or through gross negligence. *Id.* at 109. "By contrast, when the destruction of evidence is negligent, relevance must be proven through extrinsic evidence." *Arista Records LLC*, 608 F. Supp. 2d at 439 (citing *De Espana v. Am. Bureau of Shipping*, 2007 WL 1686327 at *6). "This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. at 431 (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. at 77).

Because I have concluded that the destruction of Lent's documents amounted to gross negligence, I may assume that his files were relevant. In addition, the relevance of Lent's

destroyed files has been confirmed by a review of Bazinet's emails, which includes emails to and from Lent relating to facts and issues pertinent to Crown's claims in this litigation.

In sum, Nudd has satisfied its burden of showing that Crown spoliated evidence by permitting the destruction of Lent's files. I do not find that the record demonstrates that the files of any other employee were destroyed or lost, notwithstanding Crown's failure to institute a litigation hold. Although Vadney destroyed emails weekly, he was not a key employee whose documents Crown was obligated to preserve. While Bazinet and Kyriacopoulos were key employees, Nudd has not demonstrated that either of them deleted emails.[17] Kyriacopoulos testified that his policy was to save emails and that he never deleted emails "of substance." (Docket # 184-12, Ex. I1 at 10). Finally, given the sheer volume of emails that have been produced from Bazinet's computer and Bazinet's affirmation that he regularly saved emails relating to Nudd monopoles (Docket # 197-30, Ex. 19 at ¶¶ 5-8), any contention that Bazinet deleted emails that would have been favorable to Nudd cannot be supported.

## II.   Production by Crown in 2009 of Responsive Documents

Rule 37 provides that a court may impose sanctions if "a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or a written response." Fed. R. Civ. P. 37(d)(1). In addition to the full panoply of sanctions that a court may consider imposing for a violation of this rule, the court "must require the party failing to act . . . to pay the reasonable expenses, including

---

[17] Presumably, counsel explored that issue during their depositions; if any testimony that they deleted Nudd-related emails had been adduced, it surely would have been relied upon by Nudd in making this motion.

attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(d)(3); *Handwerker v. AT & T Corp.*, 211 F.R.D. 203, 208 (S.D.N.Y. 2002), *aff'd*, 93 F. App'x 328 (2d Cir. 2004). The court has "wide discretion to impose sanctions and determine the type of sanction to be imposed under Rule 37(d)." *40 Gardenville LLC v. Travelers Prop. Cas.*, 2004 WL 1055821, *2 (W.D.N.Y. 2004) (citing *Reilly*, 181 F.3d at 267).

Crown does not dispute that the late-produced emails are relevant or responsive to Nudd's discovery requests. Nudd served interrogatories and document requests in 2006, and Crown produced over 30,000 pages of documents that year. Despite the volume, the production did not include any emails created or sent before 2004.

In response to Nudd's inquiries during the 2007 oral argument about the absence of any documents predating 2004, Crown represented that its search had encompassed those documents, but that none had been found. This Court directed counsel to submit an affidavit confirming that Crown's search for responsive documents had not been chronologically limited. Counsel did so. Despite those inquiries from opposing counsel and the Court, and the Court's direction to confirm the accuracy of counsel's in-court representations, Crown's "due diligence" failed to uncover the existence of any pre-2004 emails until three years after its production and two years after its representations to this Court.

Crown's woefully-late production apparently could have been avoided by a simple, direct question of Bazinet, the key Crown employee, whether he had any emails predating 2004. The reasonable inference from the record is that Bazinet was not queried in

2007 specifically about the absence of emails earlier than 2004. Instead, it appears that counsel merely sought confirmation of the search parameters from a member of Crown's in-house staff.

Crown's efforts to collect and produce documents from Kyriacopoulos were similarly wanting. Kyriacopoulos, as the engineer who was responsible for issues related to the Nudd monopoles, plainly was an employee who was likely to possess documents relevant to the claims at issue in this litigation. Despite that fact, he was not instructed to preserve documents and it was not until 2009 – after this motion was filed and, inexplicably, months after he testified at his deposition that he might still possess relevant documents – that twenty-two emails from him were produced.

I also find that Crown failed to timely produce the engineering reports from other firms analyzing the load capacity of various Nudd-designed monopoles. (*See* Docket ## 184, Exs. V-CC). As discussed *supra*, I reject Crown's contention that they are not responsive to Nudd's interrogatories and document requests. While insufficient information has been provided for this Court to determine whether responsibility for the late production lies with counsel or with the plaintiffs themselves, "[a]t the end of the day . . . the duty to preserve and produce documents rests on the party." *Zubulake*, 229 F.R.D. at 436.

## III.  Failure to Comply with May 3, 2007 Order

Nudd also argues that Crown failed to comply with an order of this Court. During the May 3, 2007 oral argument, this Court directed counsel for Crown to confirm with his client that the search for responsive documents had not been restricted to post-2004 documents and to submit an affidavit of a person with knowledge on the issue. (Docket # 184 at 82-83). Crown

submitted an affidavit from a paralegal in Crown's legal department, who affirmed that the search for responsive documents "was not limited to a particular period of time or a period of time which post date 2004. To the contrary, Crown's search was not limited to chronology and reasonably sought all documents within Crown's possession, custody and control that were potentially responsive to the parties' discovery requests." (Docket # 184-8, Ex. G).

Specifically, Nudd contends that Crown violated this Court's direction by "produc[ing] an affidavit incorrectly attesting to its search efforts." (Docket # 184 at 35). Nudd's argument rests on the assumption that the affidavit was false because Crown later produced documents that were created prior to 2004. No evidence has been adduced to suggest that Crown's earlier search had in fact been chronologically limited or that the affidavit was knowingly false when it was submitted. Accordingly, I decline to find that Crown violated my May 3, 2007 oral direction.

## IV. **Appropriate Remedies**

Having determined that Crown destroyed documents belonging to Lent and much-belatedly produced responsive emails and engineering reports, I now turn to the question whether sanctions are appropriate.

### A. **Spoliation**

"The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d at 436. As the Second Circuit has observed:

> [T]he applicable sanction should be molded to serve the
> prophylactic, punitive, and remedial rationales underlying the
> doctrine.  The sanction should be designed to: (1) deter parties
> from engaging in spoliation; (2) place the risk of an erroneous
> judgment on the party who wrongfully created the risk; and
> (3) restore the prejudiced party to the same position he would have
> been in absent the wrongful destruction of evidence by the
> opposing party.

*West*, 167 F.3d at 779 (citing *Kronisch v. United States*, 150 F.3d at 126) (internal quotation and citation omitted).

Dismissal or an entry of judgment against a party is "an extreme sanction, to be imposed only in extreme circumstances."  *Jones v. Niagara Frontier Trans. Auth. (NFTA)*, 836 F.2d 731, 734 (2d Cir. 1987), *cert. denied*, 488 U.S. 825 (1988).  Before imposing a sanction of dismissal, a court should make a finding of willfulness or bad faith, *Valentine v. Museum of Modern Art*, 29 F.3d 47, 49 (2d Cir. 1994), and should consider whether lesser sanctions would be effective, *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 139 (2d Cir. 2007).  The most severe sanctions may be imposed not only to punish the offending party, but also "to deter those who might be tempted to such conduct in the absence of such a deterrent."  *Valentine v. Museum of Modern Art*, 29 F.3d at 49-50 (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)).

Defendants urge this Court to sanction Crown by dismissing the complaint in its entirety.  Judged by the above-cited authority, dismissal is too harsh a remedy to be justified by this record.  Most importantly, although Crown's failure to implement an adequate litigation hold resulting in the destruction of Lent's documents amounted to gross negligence, it did not amount to willfulness or bad faith.  Accordingly, dismissal of Crown's complaint is inappropriate.

Nor do I find that an adverse inference instruction is justified by the record as it has been developed to date. An instruction to the jury "that the [destroyed] evidence would have been unfavorable to the party responsible for its destruction," *Kronisch*, 150 F.3d at 126, "serves to 'restor[e] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence.'" *De Espana*, 2007 WL 1686327 at *7 (quoting *Kronisch*, 150 F.3d at 126) (alteration in original). For this reason, an adverse inference instruction may not be appropriate where the destruction of evidence has not prejudiced the movant. *See*, *e.g.*, *Residential Funding, Corp.*, 306 F.3d at 112 (instructing the district court on remand to consider monetary sanctions in lieu of an adverse inference instruction if no prejudice is found); *Toussie*, 2007 WL 4565160 at *9 (declining to order adverse inference instruction where the movant had "not sufficiently demonstrated that the destroyed/lost emails were favorable" to its case); *De Espana*, 2007 WL 1686327 at *8 (same).

Here, although Crown breached its duty to implement a litigation hold, the record does not reveal that Nudd was actually or likely prejudiced by the destruction of Lent's emails. Nearly 500 emails sent to and received by Lent have indeed been produced from other employees' files. Although Lent may have had additional electronic documents that were not preserved, no record has been made thus far to support a finding that the electronic documents that were not preserved included emails favorable to Nudd's defenses. Once Lent is re-deposed with respect to the Bazinet emails, the cost of which shall be borne by Crown,[18] counsel may inquire further into the subject of Lent's electronic documents. If his deposition testimony

---

[18] *See* discussion *infra* at 33.

reveals the likelihood that documents favorable to Nudd's defenses were not preserved, then defendants may renew their request for an adverse inference instruction.

## B.  Belated Production of Responsive Documents

I next consider whether sanctions are appropriate for Crown's late production. Nudd and Underhill argue that they were prejudiced by the unavailability of the documents to oppose Crown's motion to reconsider and its motion to amend its complaint.  (Docket ## 202 at 6; 193-2 at ¶¶ 9-11).  Specifically, Nudd contends that Judge Telesca would not have reinstated Crown's claims had he been aware of these documents because they "strongly contradict Crown's claims of lack of notice and knowledge of the alleged defects, and of their reliance on a 'special relationship' with Nudd."  (Docket # 202 at 6).  Thus, Nudd argues that Crown improperly obtained reconsideration of Judge Telesca's decision and that Nudd was prejudiced by reinstatement of Crown's claims.  (*Id.* at 6-7).

I note preliminarily that Judge Telesca expressly did not make findings that Nudd concealed the defect or had a special relationship with Crown; rather, he simply found that Crown had raised questions of fact as to these issues.  Whether the recently discovered documents resolve those issue of fact is a question that Judge Telesca likely will address in connection with Nudd's Rule 11 motion currently pending before him, which seeks vacatur of his reconsideration motion.  Even if he does not address that question on the Rule 11 motion, both Nudd and Underhill are free to move for reconsideration of his August 13, 2008 decision.  If Judge Telesca ultimately determines that the documents that Crown belatedly produced would have defeated its motion for reconsideration, then I respectfully suggest that the district court consider, or refer to me for consideration by report and recommendation, whether defendants

should be reimbursed by Crown for their expenses incurred after the August 2008 decision in litigating the erroneously reinstated claims.

Finally, Nudd contends that it was prejudiced by Crown's late production because it was unable to question deposition witnesses regarding those documents. (*Id.* at 6). I agree with defendants that they should be afforded the opportunity to depose or re-depose witnesses about documents included in the 2009 production. Nudd and Underhill shall notify Crown of the additional depositions they intend to take by no later than **April 14, 2010**,[19] and the depositions shall be completed by no later than **May 28, 2010**. I recommend that Crown be ordered to bear the costs of those additional depositions. *Zubulake*, 229 F.R.D. at 437 (ordering party to bear costs of depositions and re-depositions required by its late production).

For its part, Underhill complains that Crown's late production and destruction of evidence deprived it of evidence upon which it could have successfully relied in moving to dismiss Crown's claims against it, and thus caused Underhill to incur unnecessary and substantial litigation costs. (Docket # 193-2 at ¶ 11). As with Nudd's argument, Underhill's position is premised on the contention that the newly-discovered evidence would have compelled Judge Telesca to conclude that no genuine issue of fact exists that Crown was aware of the possible defects and did not rely upon the superior knowledge of Nudd or its engineering expert, Underhill. For the same reasons that I find this argument too speculative to justify an award of litigation expenses in favor of Nudd, I find it too speculative to justify an award of litigation expenses in favor of Underhill.

---

[19] Crown shall notify this Court promptly in writing of any objections it has to defendants' list of proposed deponents.

In addition to bearing the costs of the additional depositions, I recommend that the district court order Crown to reimburse both Underhill and Nudd for their attorneys' fees and costs associated with the instant motions. *Bellinger v. Astrue*, 2007 WL 2907320, *1 (E.D.N.Y. 2007) (imposing attorney's fees for defendant's failure "to respond to plaintiff's document demands in a prompt and complete manner") (citing Rule 37(d)); *Texas Instruments Inc. v. Powerchip Semiconductor Corp.*, 2007 WL 1541010, *16 (S.D.N.Y. 2007) (awarding fees and costs associated with filing motion for sanctions under Rule 37(d)); *Chan v. Triple 8 Palace, Inc.*, 2005 WL 1925579 at *10 (awarding attorneys' fees and costs incurred in bringing spoliation motion).

## CONCLUSION

For the reasons stated above, I recommend that the district court grant Nudd's and Underhill's motions for sanctions **(Docket ## 186, 193)** and order Crown to bear the costs of additional depositions and to reimburse them for attorneys' fees and costs associated with the pending motions. I further recommend that the district court deny defendants' request for dismissal of Crown's complaint.

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
March __31__, 2010

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>**Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**</u>

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
　　　　March ___31___, 2010